UNITED STATES DISTRICT COURT  ONLINE PUBLICATION ONLY
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
FREDERICK EDWARD,

                       Plaintiff,            MEMORANDUM AND ORDER

     -against-                            10-CV-5890 (JG)

MICHAEL J. ASTRUE, Commissioner
of Social Security,

                       Defendant.
----------------------------------------------------------------x
A P P E A R A N C E S:

       HERBERT S. FORSMITH
            26 Broadway, 17th Floor
            New York, New York 10044
            *Attorney for Plaintiff*

       LORETTA E. LYNCH
            United States Attorney
            Eastern District of New York
            271 Cadman Plaza East
            Brooklyn, New York 11201
       By:    James R. Cho
                Jessica Ball
            *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

       Plaintiff Frederick Edward seeks review, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), of the Commissioner of Social Security's denial of his application for disability benefits. The parties have cross-moved for judgment on the pleadings; the Commissioner seeks a judgment upholding his determination and Edward seeks a remand for further proceedings or for the calculation of benefits. I heard oral argument on July 8, 2011. Because the Commissioner's decision is not supported by substantial evidence in the record, I deny his

motion. The cross-motion is granted, and the case is remanded to the Commissioner solely for the calculation of benefits.

BACKGROUND

A.  *The Plaintiff's Statements and Testimony*

Edward, a 67-year-old naturalized citizen, completed high school and college in his native India, working there as a seaman for three years prior to his emigrating to the United States in 1974. Shortly thereafter, he met and married his wife, and the couple had two sons.

From 1974 until 1988, Edward was employed as a "ship visitor" by the Seamen's Church Institute, providing social worker and/or community worker services to seamen from third-world countries whose ships were anchored in New York Harbor. From approximately 1988 to 1995, he was self-employed as an "exporter," handling business and logistical tasks related to exporting construction materials to the Middle East. In his capacity as an exporter he performed inspections of materials at manufacturers' facilities across the country and internationally, bookkeeping and accounting, supervision of manual laborers, and general office duties.

In or prior to 1993, Edward developed severe hypertension, diabetes, and back pain. He underwent physical therapy for the back pain in 1993. By 1995, he regularly took various medications, including medication for his hypertension. He also smoked approximately ten cigarettes per day, as he had for nearly 35 years. On May 8, 9, and 10, 1995, Edward skipped his hypertension medication; on May 11, 1995, he suffered a stroke.

Although the stroke initially caused only a slight limp and some numbness on the right side of Edward's body, his symptoms became more severe as time went on. In August of 1995 he made the first of several complaints to his physician of "forgetting abruptly," R. 431; he

also made such complaints on May 21, 1996 and June 11, 1996, and on July 10, 1996, he reported that he was growing more forgetful.  Although in January of 1996 he was able to do light cooking, cleaning, writing, and occasional shopping, as well as undergo physical therapy, by September 1996 he suffered chronic pain and his right arm was nearly useless.  He could not drive, stand, or walk for long, and could not climb steps at all.  In December 1996, he reported pain that had become more severe in his left shoulder, arm, and hand.  By August of 1997 he could not perform any household chores because his right side was entirely numb, and he could not lift more than five pounds with his right hand.  R. 497-99.

B.  *The Medical Evidence*

1.  *The Treating Physicians*

From December 1989 through at least October 1999, Edward was treated by Dr. Antonio Vinluan, an internist, for conditions including broken ribs, high triglycerides, hypertension, and diabetes mellitus.  R. 123-33.  In July 1993, after MRI testing, Vinluan diagnosed Edward with a diffuse posterior spondylotic ridge at C3-C4,[1] left-sided posterior spondylotic ridge at C5-C6, a small focal central disc protrusion at C4-C5, and moderately severe right foraminal stenosis at C4-C5 with mild right-side stenosis at C5-C6 and C3-C4.[2]  R. 113.  He also diagnosed right-side radiculopathy.[3]  R. 154-55.

---

[1] "Cervical spondylosis is a general term for age-related wear and tear affecting the disks in your neck. . . .  Cervical spondylosis . . . [is] most common in people older than age 55, and [it] progress[es] with age.  Many people with signs of cervical spondylosis . . . on X-rays manage to escape associated symptoms, which include pain, stiffness and muscle spasms."  Mayoclinic.com, Cervical Spondylosis (2010), http://www.mayoclinic.com/health/cervical-spondylosis/DS00697.

[2] "Foramina" refers to natural openings through bone or tissue. The American Heritage Medical Dictionary (2007), http://medical-dictionary.thefreedictionary.com/foramen.  "Stenosis" refers to "stricture of any canal or orifice." WebMD, Stedman's Medical Dictionary (28th ed. 2006), http://dictionary.webmd.com/terms/stenosis.xml.

[3] "Radiculopathy is a condition due to a compressed nerve in the spine that can cause pain, numbness, tingling, or weakness along the course of the nerve.  Radiculopathy can occur in any part of the spine, but it is most common in the lower back (lumbar radiculopathy) and in the neck (cervical radiculopathy)."  MedicineNet.com, Radiculopathy (2010), http:// www.medicinenet.com/radiculopathy/article.htm.

3

In October 1993 Dr. Vinluan referred Edward to Dr. Raul P. Sala, who diagnosed him with a C5-C6 radiculopathy due to a herniated disc of the cervical spine. Sala referred Edward to physical therapy in November 1993, and apparently did not see him again until May 1995.

On May 11, 1995, the day of his stroke, Edward was admitted to the Doctor's Hospital of Staten Island with sudden-onset symptoms including right-sided weakness and numbness. Medical records note hyperesthesia and atrophy in his right arm, as well as a slight decrease in muscle power in his right arm and leg. He was treated with medication and physical therapy and discharged five days later with diagnoses of hypertension, diabetic neuropathy,[4] sciatica,[5] and left cerebral infarction,[6] all controlled. Dr. Vinluan's follow-up notes indicate that by October 1995 Edward's hypertension was better and his diabetes had improved, and that by the following month the hypertension had improved so much that Vinluan discontinued at least one of Edward's hypertension medications.

On May 23, 1995, in a post-stroke follow-up appointment, Dr. Sala observed that cervical range of motion was decreased by approximately 20 degrees and that paracervical tenderness and right extremity hemiparesis[7] were present. He also noted that the plaintiff was oriented and in no apparent distress. R. 169. He again prescribed physical therapy, which apparently succeeded to some extent, based on progress notes from August and November 1995.

---

[4] Diabetic neuropathy is a type of nerve damage typically characterized by numbness or tingling in the extremities that can eventually lead to the deterioration of bodily systems including the heart and digestive system. It is a common serious complication of diabetes. *See* Mayoclinic.com, Diabetic Neuropathy (2010), http://www.mayoclinic.com/health/diabetic-neuropathy/DS01045.

[5] "Sciatica refers to pain that radiates along the path of the sciatic nerve and its branches -- from [the] back down [the] buttock and leg." Mayoclinic.com, Sciatica (2010), http://www.mayoclinic.com/health/sciatica/DS00516.

[6] Cerebral infarction refers to brain necrosis arising from complete and prolonged blood loss to that area of the brain. A cerebral infarction affects all tissue elements, neurons, glia, and vessels. *See* Neuropathology, Cerebral Ischemia and Stroke (2011), http://neuropathology-web.org/chapter2/chapter2bCerebralinfarcts.html.

[7] "Hemiparesis is muscle weakness on only one side of the body." Jose Vega, Hemiparesis, About.com: Stroke (2008), http://stroke.about.com/od/glossary/g/hemiparesis.htm.

In progress notes from July through December of 1995 Sala recorded Edward's complaints that he was unable to write properly or to lift or move his right hand properly. He was also unable to drive or climb stairs, and he had difficulty walking and numbness in his right arm and right leg. R. 165-67. In a letter written on November 18, 1999, Sala wrote that, in his opinion, "Edward is disabled due to his multiple medical problems." R. 257.

In a letter dated October 19, 1995, treating neurologist Dr. Lourdes Esteban noted that Edward suffered from a history of cerebral infarction, cervical disc protrusion with stenosis, cervical radiculopathy, and peripheral neuropathy. She also noted his non-neurological diagnoses of hypertension, diabetes, and heart disease. At some point, Esteban also prescribed Prozac to treat a diagnosis of dysthymia. As a result of all of these diagnoses, she concluded that Edward was disabled as of October 19, 1995. R. 148.

In January 1996 Dr. Vinluan noted that Edward suffered from a "very mild residual hemiparesis right side . . . [and] a very mild residual motor and sensory deficit on the right side." R. 149. In April 1996 Vinluan diagnosed radiculopathy and restricted strenuous mental and physical activities; he also noted right-sided weakness and well-controlled blood pressure. R. 140, 190. In May, June, and July 1996, Vinluan noted Edward's complaints of forgetfulness, and in September, October, and November 1996 he noted Edward's complaints of confusion. *See* R. 142-143, 203-05.

On November 5, 1999, Dr. Srinivas Duvvuri, a cardiologist, summarized Edward's various physical ailments in a letter. Edward was diagnosed with hypertension, diabetes mellitus, and severe coronary artery disease, the latter of which required repeated medical intervention and coronary bypass surgery in late 1998. Edward also suffered residual right hemiparesis from his stroke, as well as radiculopathy from his cervical disc herniation. In

5

sum, he wrote, Edward's "multiple medical problems" rendered him "physically and psychologically disabled." R. 256.

2.  *Consultative Records*

In November 1996, Edward underwent a consultative examination by Dr. Jung Hahn. Hahn reported Edward's claims of pain in the right side of his neck, right shoulder, and right arm, as well as numbness along his right side and extremities. Based on his own observations, Hahn recorded slight limping on the right side, an inability to perform heel-to-toe gait, and slightly weakened facial muscles. Although tendon reflexes were decreased, Hahn noted no muscular atrophy and normal muscle tone in all extremities. He also noted Edward's complaints of reduced memory. For the first time, Edward also reported pain in his left arm and shoulder, which Edward stated had begun in approximately August 1996. Finally, Hahn noted that Edward was on medications for heart disease, diabetes, and indigestion, including Vasotex, Norvasc, Zantac, and Glucotrol. R. 150-53.

The following month, on December 11, 1996, state agency physician Dr. Pellegrino examined Edward's medical records and determined that he was able to perform light exertional work -- specifically, that Edward could occasionally lift and/or carry up to twenty pounds, frequently lift/carry up to ten pounds, stand and/or walk for about six hours per day, sit about six hours per day, and push and/or pull as desired. He found no postural, manipulative, visual, communicative, or environmental limitations. R. 45-52.

C.  *Vocational Expert Testimony*

At hearings conducted in 2003 and 2009, testimony was given by Melissa Fass Karlin, a vocational expert. Fass Karlin first determined that the "ship's visitor" position did not match any of the listings in the Dictionary of Occupational Titles ("DOT"). R. 495. However,

6

based on Edward's description of his work activities, she testified that the nearest DOT match would be a "community placement person which is like a light, skilled job." *Id.* She then evaluated the work Edward performed as an exporter, compared the position as he performed it to the description of the position in the DOT, and determined that it was a sedentary, skilled position as performed by Edward. R. 496.

D.   *Past Remand Orders*

This 15-year-old case began on February 9, 1996, when Edward applied for supplemental security income, alleging that he had been disabled since May 11, 1995 as a result of a stroke on that date, cervical disc problems present since July 1993, and ongoing conditions of hypertension and diabetes. R. 29-31. His claim was denied, and he requested a hearing before an administrative law judge ("ALJ"), which was granted. He appeared and testified before ALJ Peter Crispino on August 18, 1997, and benefits were denied on September 16, 1997. *See* R. 329-48. Edward appealed, and 22 months later, on July 27, 1999, his appeal was granted, the denial of benefits was vacated, and a supplemental hearing was ordered. R. 247-50, 252-54.

Edward testified again before ALJ Crispino at the supplemental hearing, which was held on November 30, 1999. On May 17, 2000 the ALJ again found that Edward was not disabled. R. 259-72. More than 26 months later, on July 30, 2002, the Appeals Council again vacated the ALJ's decision and remanded the case, this time to a new ALJ. R. 283-86. Yet another hearing was conducted by ALJ Mark Sochaczwsky on July 23, 2003, at which Edward again testified, as did vocational expert Melissa Fass Karlin. Relief was denied on December 13, 2003, R. 10-21. Edward once again sought review, and 19 months later, on July 15, 2005, the Appeals Counsel denied his request. R. 4-7.

Edward thereafter filed a civil action in this district, *Edward v. Barnhart*, 05-CV-4222 (DLI)(CLP), which the parties agreed to remand back to the Commissioner on July 31, 2006, pursuant to the fourth sentence of 42 U.S.C. § 405(g).  On remand, the Appeals Council issued an order on September 25, 2006, instructing the next ALJ to hear the case on how to cure the legal errors that had led to the remand.  R. 450-53.

Twenty-six more months passed before Edward got his hearing on January 14, 2009, at which both Edward and Fass Karlin testified.  On January 30, 2009, ALJ Michael Friedman concluded that Edward was not disabled within the meaning of the Social Security Act because he retained the residual functional capacity to perform sedentary work with no mental limitations as defined in 20 C.F.R. § 416.967(a), and therefore could return to his past relevant work as an exporter.  R. 426-36.  The Appeals Council denied Edward's request for review on December 17, 2009, thus making the ALJ's adverse decision the final decision of the Commissioner.  R. 413-16.  *See DeChirico v. Callahan*, 134 F.3d 1177, 1179 (2d Cir. 1998).

E.     *The Current Action*

Edward seeks review of the Commissioner's decision denying him benefits.  The Commissioner has filed a motion for judgment on the pleadings, arguing that the decision is supported by substantial evidence and that the ALJ fully followed the instructions of the Appeals Council.  Edward has filed a cross-motion for judgment on the pleadings, arguing that the Commissioner had again failed to properly adjudicate his case and requesting a remand for the calculation of benefits.

As discussed below, the ALJ failed to follow the instructions of the Appeals Council, and therefore the legal deficiencies in the past determinations denying Edward benefits have not been cured.  The Commissioner has had ample opportunities to correct the legal

8

deficiencies in his evaluation of Edward's disability status. This case has been pending for 15 years, and the 2009 hearing was the Commissioner's third chance to correct his errors. Given the history of the case, I will not require Edward to endure yet another round of hearings in the agency. I therefore remand solely for the calculation of benefits.

## DISCUSSION

A.  *The Standard of Review*

To be found eligible for disability benefits, Edward must show that, "by reason of [a] medically determined physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy," *id.* § 423(d)(2)(A).[8] On review, the question presented is whether the Commissioner's decision to deny Edward benefits is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (*per curiam*). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 31 (internal quotation marks omitted).

The Social Security regulations direct a five-step analysis for evaluating disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe

---

[8] Work may be substantial even if it is not full-time or if it generates less income or carries less responsibility than previous employment. 20 C.F.R. § 404.1572. *Id.* Work is gainful "if it is the kind of work usually done for pay or profit, whether or not profit is realized." *Id.* Activities such as household tasks, hobbies, therapy, school attendance, club activities, or social programs are generally not considered to be substantial gainful activity. *Id.*

9

> impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

*DeChirico*, 134 F.3d at 1179-80 (internal quotation marks omitted); *see* 20 C.F.R. § 404.1520. The claimant bears the burden of proof in the first four steps, the Commissioner in the last. *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

B.  *Analysis*

The ALJ followed the five-step procedure outlined above. He determined that Edward had not engaged in substantial gainful activity since May 11, 1995, the date of his stroke, and that he had "severe impairments" of hypertension, diabetes, disc protrusion with radiculopathy, and status-post cerebral infarct. He found that none of Edward's severe impairments met or medically equaled one of the listed impairments, and determined that he had the "residual functional capacity to perform sedentary work which is not further reduced by mental limitations." R. 435, *see* 20 C.F.R. § 416.967(a) ("Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are

10

met."). The ALJ specifically found that Edward was capable of performing his past relevant work. At the fifth step, the ALJ concluded that Edward was not disabled under the Social Security Act because he retained the residual functional capacity to perform his past relevant work. R. 435.

1.  *Past Applications of* DeChirico *in this Case*

Edward's eligibility for benefits has been evaluated several times according to the above standard. In each of the evaluations, although the five-step process had been followed, the Appeals Council has found deficiencies in the decision-making process requiring the conclusion that the denial of benefits was not supported by substantial evidence in the record. Each time such deficiencies were found, the Appeals Council remanded the case to the ALJ with specific instructions on how to remedy them. The opinion of ALJ Friedman, which gave rise to the final decision of the Commissioner on review in this case, is thus evaluated here not only to determine whether it is supported by substantial evidence, but also to determine whether the ALJ adequately responded to the most recent set of instructions from the Appeals Council and cured the outstanding deficiencies.

2.  *Instructions on Remand*

On remand, ALJ Friedman was responsible for complying with the September 25, 2006, remand order of the Appeals Council (the "Order"), which itself incorporated the parties' joint stipulation and order endorsed by Judge Irrizary on July 31, 2006. The Order directed the ALJ to

> offer the claimant the opportunity for a hearing; reevaluate all the medical opinion evidence of record, to include the opinions of Drs. Est[e]ban and Vinluan, and recontacting them for clarification of their opinions and corroborating medical records in support thereof; reevaluate the claimant's credibility; reevaluate the claimant's physical and mental residual functional capacity on a function-by-function basis *to include evaluating*

11

> *whether he had any job-related limitations secondary to his complaints of forgetfulness and being easily confused*, and providing a narrative discussion describing how the evidence supports each conclusion, citing specific medical and non-medical evidence; at the 4th step of sequential evaluation, reevaluate the physical and mental requirements of the claimant's job as an "exporter," as actually and generally performed, and, directly compare the claimant's reevaluate[d] residual functional [capacity] against such requirements . . .; if the evaluation of disability proceeds to the 5th step of sequential evaluation, obtain, as necessary, additional vocational expert testimony; take any further action needed to complete the administrative record and issue a new decision.

R. 452 (citations omitted) (emphasis added).

C.  *The ALJ Failed to Comply with the Appeals Council's Instructions*

The hearing and the written opinion that arose out of it failed to comport with the requirements of the Appeals Council Order for several reasons. First, the ALJ failed to properly pursue further information and clarification from Drs. Esteban and Vinluan. Second, the ALJ failed to evaluate whether Edward had "any job-related limitations secondary to his complaints of forgetfulness and being easily confused." R. 452. Third, the ALJ failed to "reevaluate the . . . mental requirements of the claimant's job as an 'exporter.'" *Id.* Because the ALJ did not adequately address the issues that the Commissioner conceded barred a determination that the adverse decision was supported by substantial evidence, I must remand this case to the Commissioner. However, because the same problems with the Commissioner's decision have appeared repeatedly in this case and I have no reason to believe that yet another remand will remedy those problems, *see Balsamo v. Chater*, 142 F.3d 75, 82 (2d Cir. 1998), I decline to remand for further proceedings, and instead remand solely for the calculation of benefits.

1.  *Clarification from Treating Physicians*

The first instruction on remand from the Appeals Council was for the ALJ to seek out clarification and supplementation of the medical record from Drs. Vinluan and Esteban.

12

Both doctors were treating physicians who had declared the plaintiff disabled, but previous ALJs had discounted their opinions because the medical record underlying those declarations was sparse. Dr. Esteban, the treating neurologist, concluded that Edward was disabled secondary to disc disease, cervical radiculopathy, peripheral neuropathy, hypertension, diabetes, heart disease, and psychiatric disorder. R. 431. Dr. Vinluan concluded that Edward was disabled secondary to his "multiple medical problems," including chronic neck pain since July 16, 1993 (requiring the use of codeine on an as-needed basis), diabetes, stroke, and hypertension. R. 255.

In an effort to comply with the Order, on September 13, 2007 ALJ Friedman sent letters to Drs. Vinluan and Esteban requesting that they submit "appropriate clarification" and "supportive medical documentation."[9] Pl. Br. at 6. The letter to Dr. Vinluan never received a response, although it was sent to his current address. The letter to Dr. Esteban was returned by the post office; another letter was sent to the same address, but was returned marked "unclaimed." R. 430. Further inquiry from plaintiff's counsel revealed that Dr. Esteban had moved her office ten years before (in 1999), and was at a new address.

The ALJ's efforts do not constitute compliance with the Order. The Commissioner argues that, because the "ultimate burden of proving disability, including the burden of furnishing evidence establishing disability, rests with the plaintiff," Def. Br. at 3, the ALJ was under no obligation to inquire beyond the address information provided by the plaintiff. But the administrative process for the resolution of disability claims is non-adversarial, and all parties are under an obligation to make their best efforts to bring the matter to the fairest possible

---

[9] Edward argues that the letter did not fully explain the need for evidence "regarding the vocational effects of the plaintiff's alleged and reported easy confusion, memory lapses, general forgetfulness, dizziness, weakness, pain, and the inability to tolerate strenuous mental o[r] physical work-related activity." Pl. Br. at 6. However, the letter comported with the literal requirements of the Appeals Council order, which simply instructed the ALJ to inquire of Drs. Vinluan and Esteban "for clarification of their opinions and corroborating medical records in support thereof." R. 452. The problem with the letters was not their content, but rather the lack of a genuine and diligent effort to get them into the hands of Drs. Vinluan and Esteban.

13

resolution. ALJ Friedman was obligated to make a substantive attempt to cure the deficiencies in prior ALJ decisions in the case and to procure the further information required by the Appeals Council. Indeed, a proper evaluation of the doctors' conclusions that Edward is disabled has been a driving force for at least two of the three Appeals Council remands in this 15-year-old case. *See* Appeals Council Remand, September 25, 2006, R. 451-52 (ordering the ALJ to re-contact the treating sources); Appeals Council Remand, July 27, 1999, R. 253 ("The hearing decision does not contain an adequate evaluation of the treating sources' opinions."). In this case especially, where a simple inquiry would have revealed the changed address for Dr. Esteban, and a phone call, or even a second letter, would likely have attracted the attention of Dr. Vinluan, the lack of a diligent effort to address a problem that has plagued this case from the beginning is troubling.

      2.    *Cognitive Limitations*

The Appeals Council instructed ALJ Friedman to determine whether Edward suffered from any job-related limitations arising from his cognitive complaints. On this point, the hearing and subsequent opinion fall short. At the hearing, the ALJ did not ask a single question of Edward to determine the existence or extent of his cognitive limitations. *See* R. 493-503. Nor, as discussed above, did he take sufficient steps to obtain information from Dr. Vinluan, whose records indicate that Edward was complaining of forgetfulness as early as mid-1995. The ALJ had no more information on Edward's cognitive issues than did ALJ Sochaczwsky in 2003; nevertheless, he made the exact same determination regarding Edward's ability to return to work that both the District Court and the Commissioner himself agreed was insufficiently supported.

14

Even if the Appeals Council had not explicitly ordered the ALJ to evaluate Edward's cognitive abilities, the testimony of Fass Karlin, the vocational expert, should have served as a red flag that the plaintiff's cognitive limitations would be crucial to the disability determination. As she repeatedly testified, Edward's ability to return to his past relevant work -- which became the ALJ's stated rationale for his denial of benefits – turned on whether he had "some sort of psychiatric problem where he can't do skilled work." R. 533; *see also* R. 535 ("If he can go back and do sedentary work and he's got no cognitive or psychiatric deficits . . . he can go back and do his former job. However, if he's got some sort of impairment where he can't concentrate or he can only do simple, unskilled work . . . then he's going to move into sedentary, unskilled."). A finding that Edward was capable of sedentary, skilled work would support a finding of no disability, whereas a finding that he was capable only of sedentary, unskilled work would require a finding of disability. *See* R. 535-36. Since the issue of Edward's cognitive capacity to do skilled work was a critical issue, Fass Karlin's testimony should have made it clear to the ALJ that an additional inquiry into the plaintiff's cognitive abilities was necessary and that without such an inquiry an adverse decision would not be supported by substantial evidence. Because there was no such inquiry, and because the Commissioner has been on notice since at least 2003 that it was necessary, the issue of the plaintiff's cognitive limitations would itself be sufficient to merit a remand for calculation of benefits.[10]

3. *Mental Requirements of Exporter Job*

The final segment of the Appeals Council's order required the ALJ to "reevaluate," through the testimony of one or more vocational experts and the testimony of

---

[10] If the ALJ disregarded the plaintiff's claims of forgetfulness because of an adverse credibility determination, he should have made that reasoning explicit. Further, in order to make an adverse credibility determination -- especially on an issue so dispositive as the plaintiff's cognitive limitations -- the ALJ must set forth his reasons for discounting a plaintiff's subjective complaints with "sufficient specificity to enable [the district court] to decide whether the determination is supported by substantial evidence." *Miller v. Barnhart*, 2003 WL 749374, at *7 (S.D.N.Y. Mar. 4, 2003). He did not do so here.

15

Edward himself, "the physical and mental requirements of the claimant's job as an 'exporter,' as actually and generally performed, and directly compare the claimant's reevaluate[d] residual functional [capacity] against such requirements."  R. 452.  Although the ALJ inquired of the vocational expert regarding skills and physical abilities required for the exporter job, he did not inquire as to the mental requirements for the job.  *See* R. 516-17.  Nor did he seek any further information from Edward as to the cognitive requirements of the job, although he did inquire into the skills necessary to perform his prior position as an exporter, as well as its physical requirements.  *See id.* at 493-507.  As discussed above, the ALJ made no effort to develop a mental residual functional capacity finding, much less to "directly compare" such a finding against the requirements of the exporter job.  This is another failure to abide by the ruling of the Appeals Council.

## CONCLUSION

The Commissioner's motion for judgment on the pleadings is denied.  The plaintiff's cross-motion for judgment on the pleadings is granted.  The case is remanded to the Commission solely for the calculation of benefits.

So ordered.

John Gleeson, U.S.D.J.

Dated:  September 13, 2011
      Brooklyn, New York

16